UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___04/29/2022___
```

SCOTT W. HARRISON,

          Plaintiff,

    –against–

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

20-CV-5282 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Scott Harrison brings this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits (DIB). The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. §636(c) (Dkt. No. 14) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 20, 24.) For the reasons set forth below, plaintiff's motion will be denied, defendant's motion will be granted, and the case will be dismissed.

## I.    BACKGROUND

On December 15, 2014, at age 43, plaintiff was in a motor vehicle accident during which he hit his head on the sunroof of his car and briefly lost consciousness. (R. 279, 375.) At the scene, he declined to go to the hospital, but the following day he visited the emergency department, where he was treated for pain and released. (R. 279, 375, 431.) Plaintiff has not worked since, and reports that the accident left him with chronic neck pain, back pain, hip pain, headaches, blurred vision, weakness, memory loss, and diminished attention span. (R. 279, 432.) Prior to the accident, plaintiff was employed as a parts manager (and before that as a parts counterperson) at an automobile dealership. (R. 41.) He obtained a GED in 1999. (*Id.*)

Plaintiff first applied for DIB on June 16, 2015. (R. 77.) That application was closed on September 9, 2015. (*Id.*) No other information about the 2015 application appears in the record now before the Court.

On January 19, 2017, plaintiff applied again for DIB, alleging disability since December 15, 2014, due to neck, back, and hip pain, nerve damage in both hands, migraines, depression, anxiety, memory loss, and insomnia. (R. 178, 188.) The Social Security Administration (SSA) denied that application on April 6, 2017. (R. 15.) Plaintiff timely requested a hearing before an administrative law judge (ALJ), which took place by videoconference before Sandra DiMaggio Wallis on December 11, 2018. (R. 59-74.) On February 27, 2019, the ALJ issued an unfavorable decision (Decision) (R. 15-29), concluding that plaintiff was not disabled. On May 19, 2020, the Appeals Council denied plaintiff's request for review (R. 1-3), making the ALJ's determination final.

This action followed.

### A.    Medical Evidence

#### 1.    2014

Three days after the motor vehicle accident, on December 18, 2014, an MRI of plaintiff's cervical spine, ordered by chiropractor Stephen Gross, revealed that plaintiff had a "mild disc bulge" at C4-C5, "moderate to large disc bulge" at C5-C6, and "moderate disc bulge" at C6-C7. (R. 253-54.)

On December 23, 2014, plaintiff told Dr. Gross that he was experiencing loss of muscle power; sensory loss; radiating pain; post-concussion headaches; pain in the neck, arms, elbows, and shoulders; and spasms in the neck, arms, elbows, and shoulders. (R. 572.) Dr. Gross ordered an upper nerve conduction study (*id.*), and prescribed a lumbar brace and cervical traction unit.

(R. 585.) On December 29, 2014, Dr. Gross wrote a note stating that plaintiff was "unable to work for a 2 month period." (R. 595.)

### 2.    2015

In 2015, during the course of treatment, Dr. Gross wrote six more notes stating that plaintiff was unable to work because he was "totally disabled." (R. 563, 564, 588, 590, 591, 596.) In the notes, the reasons cited for plaintiff's inability to work varied and included: injuries sustained from the motor vehicle accident, neck pain, headache, lower back pain, cervical and lumbar herniations, severe concussion, multiple disc injuries, cervical dysfunction, and lower back instability. (*Id.*) The notes typically stated that plaintiff could not work for periods ranging from one to two months. (*Id.*) On May 22, 2015, Dr. Gross sent a letter on behalf of plaintiff to the State Farm Mutual Automobile Insurance Company, stating that plaintiff could not lift more than 20 pounds, could not stand for more than 20 minutes, and could not sit for more than 30 minutes. (R. 601.)

On January 15, 2015, plaintiff visited clinical neurophysiologist Surinder P. Jindal, M.D. (R. 271.) He reported a history of chronic pain in his neck and back and described the pain as "10 on [a] scale of 10." (*Id.*) On exam, Dr. Jindal noted decreased sensation along the spine and "[t]enderness and spasm" in the paraspinal cervical, trapezius, supraspinatus, and rhomboid muscles. (*Id.*) The patient was "[w]ell oriented in person, place, and time," and had "[n]o evidence of aphasia, apraxia or agnosia." (*Id.*) His "[r]ecent and remote memory" were intact, and his "[f]und of information, insight and judgment" were "appropriate for [plaintiff's] age and background." (*Id.*) Dr. Jindal assessed cervical and lumbosacral radiculopathy and recommended that plaintiff take Norco (a combination of hydrocodone and acetaminophen) for pain. (*Id.*)

On January 19, 2015, Richard Friedland, M.D. reviewed a "[n]ormal MRI" of plaintiff's right hip. (R. 603.)

On January 21, 2015, plaintiff underwent a nerve velocity test that indicated a "delay of the latency over both median motor nerves," and a "delay of the latency and slowing of the conduction velocity over median and ulnar sensory nerves." (R. 589.) Based on the test, physiatrist Mark Toman, M.D. assessed "[n]europathy, involving upper extremities." (*Id.*)

On June 24, 2015, plaintiff visited neurosurgeon Steven Jacobs, M.D., who noted a disc protrusion at C5-C6, cord compression, severe stenosis, and "weaknesses and sensory loss" in the upper extremities. (R. 317.)

On July 21, 2015, plaintiff's treating chiropractor Dr. Gross evaluated his physical functional capacity. (R. 234.) Dr. Gross reported that plaintiff's symptoms included neck pain, headache, and paresthesia of bilateral upper extremities. (*Id.*) Dr. Gross stated that plaintiff's prognosis was "[g]uarded" (*id.*) and opined that he was limited to lifting and carrying five pounds or less, standing or walking two hours or less per a day, sitting for six hours or less per day, and was also limited for pushing and pulling with the upper extremities. (R. 235.) Dr. Gross noted that plaintiff also had a visual limitation, "blurryness." (*Id.*) Dr. Gross stated that there were no other conditions significant to recovery. (*Id.*)

On August 5, 2015, Dr. Jacobs performed an anterior cervical dissection and fusion (ACDF) procedure at C5-C6. (R. 238-39.) At an August 19, 2015 follow-up consultation, plaintiff reported a lessening of his neck pain, arm pain, and numbness. (R. 322-25.)

On August 31, 2015, Peter Graham, M.D. conducted a consultative physical examination of plaintiff – presumably in connection with his initial DIB application. (R. 264-67.) Plaintiff rated his neck pain "between 6 to 9/10" and described it as constant. (R. 264.) His lower back pain was also "constant," rated "7 to 10/10," and was "worsened by prolonged siting or prolonged standing." (*Id.*) Plaintiff stated that he had "tingling in the right lower extremity, but denie[d] any weakness

in the lower extremities." (*Id.*) He told Dr. Graham that he could shower, dress himself without assistance, and cook once a week, that he spent his days watching TV and reading, and that he did not clean, do laundry, or shop. (R. 265.) He was taking Percocet (a combination of oxycodone and acetaminophen) and cyclobenzaprine (a muscle relaxant), which "help[ed] somewhat." (R. 264.)

Dr. Graham found plaintiff in no acute distress. (R. 265) He had a normal gait, normal stance, and could perform a full squat. (*Id.*) He was able to walk on his heels and toes without difficulty, get off and on the exam table without assistance, and walk without assistive devices. (*Id.*) His range of motion (ROM) in the cervical spine was somewhat restricted in all planes, but he demonstrated full ROM in the lumbar spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles. (R. 266.) His hand and finger dexterity were intact with a grip strength of 5/5 bilaterally, and his straight leg raising (SLR) test was negative bilaterally. *Id.*)

Dr. Graham diagnosed neck pain, with a "mild functional deficit," and low back pain "by history." (R. 267.) He opined that plaintiff was "[s]table" and that there was "no limitation to sitting, standing, and walking." (*Id.*) Dr. Graham also wrote that plaintiff's ability to handle objects, hear, speak and travel were normal, although he was "mildly limited to heavy lifting that requires movement of the neck." (*Id.*)

A September 16, 2015 MRI of plaintiff's brain, ordered by Dr. Jacobs, revealed "[n]o acute intracranial abnormality." (R. 289-90.)

On October 5, 2015, plaintiff followed up with Dr. Jacobs, who assessed muscle spasm and recommended physical therapy. (R. 328-31.) At a December 7, 2015 visit, Dr. Jacobs noted that plaintiff showed signs of progressive lumbar radiculopathy (R. 334) and ordered MRIs, right hip X-rays, and an EMG NCV (electromyography and nerve conduction velocity study) of the lower extremities. (*Id.*) A thoracic spine MRI taken on December 18, 2015, indicated that plaintiff

had a "small posterior disc herniation at T10-T11 with moderate facet arthropathy . . . resulting in moderate canal narrowing and likely chronic impingement upon the cord[.]" (R. 336-37.) A lumbar spine MRI indicated that plaintiff had a "heterogenous marrow signal" consistent with "mild degenerative changes" around the endplates of the vertebral body, "minimal disc bulge at L2-L3," and a "diffuse disc desiccation, worse at L2-L3." (R. 339-40.)

### 3.    2016

On January 7, 2016, Marc Rosenblatt, D.O., on referral by Dr. Jacobs, conducted an EMG study on plaintiff's lower back. (R. 292.) It showed "no sign of radiculopathy, neuropathy or myopathy." (*Id.*) Dr. Jacobs assessed "hyperalgesia over the L4 and L5 paraspinal musculature bilaterally" and "bilateral paraspinal spasm with multiple trigger points." (R. 291.) On January 18, 2016, Dr. Jacobs noted that plaintiff continued to have back pain and bilateral hip pain. (R. 300.)

On January 26, 2016, plaintiff had hip X-rays done, which came back "[n]ormal." (R. 303.) However, on February 1, 2016, Dr. Jacobs referred plaintiff to an orthopedist for evaluation of bilateral hip pain, and to a neurologist for evaluation of headaches. (R. 304-06.)

On February 4, 2016, plaintiff visited Dr. Rosenblatt for trigger point injections to treat his back pain. (R. 405.) This was the first of multiple visits, throughout 2016, for injections. Plaintiff was generally pleased (or "very pleased") with the results and demonstrated an increased range of motion following the treatment. (R. 311-12, 361-62, 407-25.)

On March 2, 2016, plaintiff returned to Dr. Jacobs, who wrote that he had "primarily musculoskeletal strain at [that] point," as his exam was "unremarkable." (R. 309.) An MRI of the brain, conducted that same day to investigate plaintiff's "severe headache," revealed a "mild bilateral anterior ethmoid air cell and frontal sinus inflammatory changes," but "no focal intracranial signal abnormality." (R. 310.)

On March 4, 2016, plaintiff's chiropractor, Dr. Gross, wrote that plaintiff was "totally disabled from 03-01-2016 until 05-01-2016." And on March 28, 2016, Dr. Gross wrote that plaintiff continued to experience neck pain. (R. 616-17.)

On March 8, 2016, plaintiff visited Richard Kanoff, D.O. for an independent medical examination (IME). (R. 431-37.) At the IME, plaintiff complained of stabbing head pains (three to four times per week, lasting "a minute or two"), memory impairment, lower back pain, and neck pain. (R. 431-32.) Plaintiff reported that he could only sit or stand for 15 to 30 minutes, could not walk more than a block, and rarely drove. (R. 433.)

Dr. Kanoff found that plaintiff was alert and oriented with normal speech and an appropriate memory. (R. 434.) His gait was antalgic, but he was able to heel walk, toe walk, squat, and rise. (R. 434-35.) He had a limited range of motion in the lumber and cervical spine, and displayed tenderness and spasm in the lumbar paraspinal musculature. (R. 435.) Dr. Kanoff diagnosed plaintiff with "post-concussion syndrome" including speech and language issues, head pain, and cognitive impairment; neck pain; cervical radiculitis with mild radiculopathy; lumbar somatic dysfunction; lumbar radiculitis with mild radiculopathy; and mild degenerative disc disease. (R. 437.) He concluded that plaintiff was "unable to return to work at this time," but that he was "able to perform his regular activities of daily living with self-limitation." (*Id.*)

On March 28, 2016, Dr. Gross wrote that plaintiff was experiencing "neck pain as well as bilateral upper extremity pain and weakness" and was "unable to work at this time." (R. 617.) On May 2, 2016, he wrote that plaintiff was experiencing "significant discomfort" and "remain[ed] totally disabled until 5-31-2016." (R. 619.) On June 1, 2016, he wrote that plaintiff continued to "experience persistent neck discomfort and loss of mobility following [a] surgical procedure" and that plaintiff's "disability continues until 06-30-2016." (R. 620.)

On June 3, 2016, plaintiff began treatment with a new chiropractor, Patrick Malouf, at the Advanced Spinal Center. (R. 275.) Plaintiff saw Dr. Malouf once or twice a week for the next nine months for spinal adjustments and related treatments. (R. 445-518.) During the second half of 2016 Dr. Malouf wrote at least three "excuse notes" stating that his patient could not work due to injuries sustained in the 2014 motor vehicle accident. (R. 548, 549, 553). On June 13, 2016, another MRI of plaintiff's brain revealed a "[f]ocal area of gliosis within the left frontal lobe with a central area of demineralization or old hemorrhage" – likely "an old hemorrhagic contusion from prior trauma. A neoplasm or vascular malformation is less likely." (R. 273.)

On June 23, 2016, plaintiff visited neurosurgeon Michael Cho, M.D. for consultation regarding his headaches, dizziness, fatigue, and memory loss. (R. 395.) He denied blurry vision, depression, anxiety, or muscle weakness. (R. 396.) On examination, Dr. Cho found that plaintiff had normal cortical function, normal bilateral II-XII cranial nerves, normal gait and station, symmetrical reflexes throughout the upper and lower extremities, and full bilateral motor strength. (*Id.*) Dr. Cho assessed spondylosis of the cervical region without myelopathy or radiculopathy, and post-concussion headache. (*Id.*) Dr. Cho referred plaintiff to a neuropsychologist "[g]iven his issues with memory[.]" (*Id.*)

On July 5, 2016, Ingrid D. Hansen, Psy.D. conducted an initial health and behavior assessment for "neuropsychological sequelae associated with concussion." (R. 279-85.) On July 11 and 18, 2016, Dr. Hansen administered a series of tests evaluating plaintiff's intellectual function, attention, memory, learning ability, executive function, language, visuospatial perception, mood, behavior, and effort. (R. 281-82.) She concluded:

> Mr. Hansen demonstrated impairments in sustained and divided attention (ability to multi-task effectively). He performed within normal limits on measures of memory for verbal information, visuospatial skills, receptive and expressive language, working memory, the ability to think flexibly and solve novel problems.

> Recall of memory for designs was impaired but improved significantly with time for consolidation. The findings were obtained in the context of average intellectual abilities and good effort on testing.

(R. 283.)

Dr. Hansen noted that plaintiff "denied any symptoms of psychological distress or challenges with regard to adjustment issues," and opined that his cognitive deficits were "not . . . disabling with respect to maintenance of gainful employment." (R. 283.) She added that his success would be enhanced "if an employer is willing to provide accommodations," such as frequent breaks, written instructions, flexible scheduling, and "routinizing" of work. (R. 283.)

### 4.    2017

Dr. Malouf wrote three more excuse slips, dated January 2, February 3, and March 1, 2017, stating that plaintiff was unable to return to work. (R. 539, 545-46.) From January 2 through April 7, 2017, Dr. Malouf saw plaintiff at least twenty times, performing spinal adjustments and other treatments for plaintiff's back pain and headache. (R. 498-518.) On February 27, 2017, Dr. Malouf wrote that plaintiff has "severe limitations physically and mentally that would inhibit his ability to gain and maintain employment" (R. 275), but did not provide any further detail or support.

On March 17, 2017, plaintiff visited neurologist Adrienne Salomon, M.D. for a consultation. (R. 426-28.) He reported that since the motor vehicle accident he had "headache almost daily," with stabbing pain in the right temporal region, though "lately it will be every 3 days." (R. 426.) Once a week he had other headaches "that involve his whole head" and last four to six hours, with photophobia, phonophobia, nausea, and vomiting. (*Id.*) Plaintiff explained that he had tried Aleve (an over-the-counter pain reliever) and Zanaflex (a muscle relaxant), neither of which gave him relief. (*Id.*) He also reported back pain, neck pain, and numbness in the extremities. (*Id.*) Plaintiff's neurological examination was normal, and his gait was normal and "steady." (R. 427.) Dr. Salomon assessed chronic migraine, numbness and tingling in both hands, paresthesia of

9

the skin, and memory difficulties. (R. 427-28.) She advised plaintiff against the use of over-the-counter medicines, prescribed a trial of Gabapentin (an anticonvulsant also used to relieve nerve pain), and stated that she would "monitor for improvement in memory with [management] of pain." (R. 428.)

On March 20, 2017, an MRI of plaintiff's cervical spine showed moderate degenerative spondylosis at C6-C7 and "straightening," but no compression fracture. (R. 382.)

### 5.     2017 Consultative Examinations

On March 20, 2017, John Caruso, M.D. conducted a consultative physical examination of plaintiff in connection with his 2017 DIB application. (R. 375-81.) Plaintiff complained chiefly of severe headaches, neck and back pain, numbness in his fingers, and memory loss. (R. 375.) Dr. Caruso observed that plaintiff had an antalgic gait and difficulty balancing himself when walking on his heels and toes. (R. 378.) Plaintiff could perform a half squat, rose from his chair with "moderate difficulty," and had "moderate limitations with rising and with climbing." (*Id.*) Plaintiff had full flexion, extension, and lateral flexion bilaterally in his cervical spine, but limited rotary movement. (R. 379.) His straight leg raising (SLR) test was negative in the supine position, but in the sitting position plaintiff could not raise his legs. (*Id.*) He had a full range of motion and 5/5 strength in his upper extremities, 4/5 strength in his lower extremities, 5/5 grip strength, and intact dexterity. (R. 379-80.)

Dr. Caruso diagnosed severe headaches, neck and back pain, bilateral finger numbness, and a history of memory loss (R. 380.) He then opined that plaintiff had "mild" visual limitations (needing corrective lenses) and "moderate" limitations with bending, twisting, and kneeling. (*Id.*) He found no standing or sitting limitations.

On March 24, 2017, Alison Murphy, Ph.D. conducted a consultative psychiatric examination of plaintiff in connection with his DIB application. (R. 385-89.) Plaintiff reported that he was taking Gabapentin daily, as well as Medrol (a steroidal anti-inflammatory) and sumatriptan (a migraine pain medication) as needed. (R. 385.) He reported frequent wakening (up to twice a night), loss of appetite (causing him to lose 25 pounds over two years), symptoms of depression and anxiety, including weekly panic attacks, and cognitive deficits, including short- and long-term memory deficits, concentration difficulties, and "planning difficulties." (R. 385-86.)

Plaintiff's mental status exam was normal except that he reported "feeling anxious today," his attention and concentration were "[m]ildly impaired," and his recent and remote memory were "[i]mpaired." (R. 387.) According to Dr. Murphy, this impairment was due to "limited intellectual functioning." (*Id.*) However, in the same report, Dr. Murphy assessed plaintiff's intellectual functioning as "average," and his insight and judgment as "[g]ood." (*Id.*) Plaintiff told Dr. Murphy that his wife "manage[d] the money" as he could not do so "effectively." (R. 387-88.)

Dr. Murphy opined that plaintiff showed "no evidence of limitations" in his ability to be aware of normal hazards, take appropriate precautions, and "[u]nderstand, remember, or apply simple directions and instructions," maintain personal hygiene, and maintain appropriate attire. (R. 388.) He had "mild limitations" in his ability to "[u]se reason and judgment to make work-related decisions," "[s]ustain an ordinary routine and regular attendance at work," "[i]nteract adequately with supervisors, coworkers, and the public," sustain concentration, and perform a task at a consistent pace. (*Id.*) Dr. Murphy added that plaintiff had "moderate limitations" in his ability to "[u]nderstand, remember, or apply complex directions and instructions," regulate emotions, control behavior, maintain well-being, and "[s]ustain an ordinary routine and regular attendance at work." (*Id.*) She concluded that plaintiff's prognosis was "[f]air" and recommended that he undergo

11

individual psychological therapy and psychiatric intervention for one year. (R. 388-89.) Dr. Murphy added that plaintiff "will need assistance to manage funds due to cognitive deficits demonstrated during the evaluation, as well as acknowledged by the claimant." (R. 389.)

On March 31, 2017, State agency reviewer Margaret Momot-Baker, Ph.D. assessed plaintiff's mental functioning based on the record to date (including the reports by Dr. Hansen and Dr. Murphy). (R. 86-88.) She concluded that he was able to understand and remember "simple instructions and procedures"; had "some difficulty" in the areas of sustained concentration and persistence, but could sustain adequate concentration to complete ordinary tasks independently on a sustained basis; exhibited "some difficulty with socialization in daily life" but was "able to interact in a socially appropriate manner"; and "would benefit from a low-stress work environment, but is able to cope with basic changes and make routine decisions." (R. 88.)

On April 6, 2017, State agency reviewer Arthur Holmberg, M.D. assessed plaintiff's physical functioning based on the record assembled to date. (R. 83-85.) He concluded that plaintiff could occasionally lift or carry ten pounds; frequently lift or carry "less than 10 pounds"; stand or walk for up to two hours in an eight-hour work day; and sit for up to six hours in an eight-hour work day. (R. 84.) Dr. Holmberg also opined that plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; and had no manipulative, visual, or environmental limitations. (R. 84-85.)

### B.    Hearing

Plaintiff appeared and testified before ALJ Wallis on December 11, 2018, by videoconference, accompanied by a non-attorney representative. (R. 59-74.) Vocational expert (VE) Renee Jubrey also appeared and testified at the hearing. (R.70-73.)

Asked to explain why he could not work, plaintiff began by describing his "debilitating headaches," which were "daily," came on suddenly, and prevented him from focusing or

concentrating. (R. 65-66.) Additionally, plaintiff testified, he was in "pain constantly" from his lower back, had trouble remembering things, and continued to experience pain in his neck, which "hasn't gotten better." (R. 66.) Plaintiff explained that he "refuse[d] to take pain killers," for fear of addiction, but had to "sit, stand, sit, stand" every 20 minutes. (R. 66-67.) In response to questions from the ALJ, plaintiff stated that he could not lift his Boston terrier, who weighed about ten pounds, and that he spent "a good portion of the day" lying down, which was "the only position that I can get comfortable [in] for an extended period of time[.]" (R. 68.) In response to a question from his own representative, plaintiff stated that his left hand "gets locked up," so "typing o[n] [his] phone or anything like that" is "not in the cards." (R. 69.) He added that when he tried to drive a shift car, he felt "pins and needles" in his feet. (R. 70.)

VE Jubrey opined that an individual with the same age, education, and work experience as plaintiff, and with his residual functional capacity (RFC) as determined by the ALJ (discussed below), could perform various sedentary jobs that exist in substantial numbers in the national economy, including as a document preparer, touchup screener, and callout operator. (R. 72.)

## C.    The ALJ's Decision

In her written Decision, the ALJ first found that plaintiff met the insured status requirements of the Act through December 31, 2019. (R. 17.) She then undertook the five-step analysis mandated by 20 C.F.R. §§ 404.1520(a)(4)(i)-(v).

At step one, *see* 20 C.F.R. § 404.1520(a)(4)(i), the ALJ found that plaintiff had not engaged in substantial gainful activity since December 15, 2014. (R. 18.) At step two, *see* 20 C.F.R. § 404.1520(a)(4)(ii), she found that plaintiff had the following severe impairments: "degenerative disc disease of the cervical spine, status post fusion at C5 to C6; degenerative changes of the thoracic spine; degenerative disc disease of the lumbar spine; ulnar and median nerve latency of the upper extremities; anxiety disorder; depressive disorder; post-concussion syndrome; and

migraine headache syndrome[.]" (R. 18.) At step three, *see* 20 C.F.R. § 404.1520(a)(4)(iii), the ALJ found that none of plaintiff's severe impairments, individually or in combination, met or equaled the severity of any of the impairments (physical or mental) listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 19.)

Plaintiff does not challenge the ALJ's findings at steps one through three.

Before proceeding to step four, the ALJ – having carefully considered "the entire record" (R. 21) – found that plaintiff had the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a),[1] but with the following additional limitations:

> He is able to perform work that does not require climbing of ladders, ropes or scaffolding and no more than occasional balancing, stooping, kneeling, crouching, crawling or climbing (ramps and stairs). The claimant is able to understand, remember and carry out simple tasks and job instructions and respond appropriately to routine changes in the workplace. He is able to work in an environment that allows him to avoid exposure to unprotected heights and hazardous machinery.

(R. 21.) In developing plaintiff's RFC, the ALJ thoroughly discussed the medical opinions in the record (R. 23-27), as well as the underlying objective evidence, and ultimately gave the greatest weight to the opinions of the State agency reviewers. (R. 26.) The ALJ explained that Dr. Momot-Baker's opinion as to plaintiff's mental impairments benefited from, incorporated, and "encompasse[d] the common elements" of the two relevant examining sources, Dr. Murphy and Dr. Hansen, who agreed that plaintiff "would struggle with higher level executive functions . . . but would have no more than 'mild,' at most, limitations with simple tasks, interacting with others and adapting to changes." (*Id.*) Similarly, in the ALJ's view, Dr Holmberg's conclusions as to

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

plaintiff's physical impairments were entitled to the greatest weight, in part because "the more ambiguous restrictions endorsed by consulting physicians Caruso and Graham are represented as well as contemplated within the State agency's medical consultant's assessment." (*Id.*) The ALJ added that the record post-dating Dr. Holmberg's review "does confirm ongoing symptoms but an overall level of stability as well as positive response to [plaintiff's] treatments for neck pain, back pain and headaches." (*Id.*)

The ALJ declined to "assign substantial weight" to the opinions of chiropractor Dr. Gross, who repeatedly pronounced plaintiff unable to work. (R. 26.) She gave four reasons: *First*, Dr. Gross did not describe any "actual functional limitations" (for example, on lifting, carrying, standing, walking, or sitting) except in one July 2015 report. (*Id.*) The rest of his reports recited boilerplate observations, repeated from visit to visit, and indicated, if anything, "that the claimant consistently reported relief from his adjustments." (*Id.*) *Second*, Dr. Gross's conclusions were both conclusory and "inherently temporary," stating that plaintiff was "disabled" for "a set period of time, typically one to two-months." (R. 27.) *Third*, Dr. Gross is a chiropractor and therefore not an "acceptable medical source" under 20 C.F.R. § 404.1502(a); while this did not bar consideration of his opinions as "other evidence," it was sufficient to assign them "an even lower probative value, especially absent collateral support from his or other providers' findings." (*Id.*) Finally, Dr. Gross's repeated conclusion that plaintiff was "disabled" encroached on a determination "reserved to the Commissioner" as a matter of law under 20 C.F.R. § 404.1527(d). (*Id.*)

At step four, *see* 20 C.F.R. § 404.1520(a)(4)(iv), the ALJ found that plaintiff could not perform his past relevant work as an automobile parts clerk. (R. 27.) At step five, *see* 20 C.F.R. § 404.1520(a)(4)(v), the ALJ determined, based on VE Jubrey's expert testimony at the hearing

(R. 70-73), that plaintiff could maintain gainful employment consistent with his RFC, including as a document preparer, touch-up screener, or callout operator. (R. 27-28.)

## II.    THE PARTIES' POSITIONS

Plaintiff makes three principal arguments. *First*, he contends that the ALJ did not correctly weight the medical opinion evidence. *See* Pl. Mem. (Dkt. No. 21) at 20. In particular, plaintiff argues that with respect to his physical impairments the ALJ violated the treating physician rule, 20 C.F.R. § 404.1527(c)(2), which applies to his claim, by giving the "greatest weight" to the opinion of a "non-examining, one-time" State agency reviewer, Dr. Holmberg, who did not see seven months of "after-acquired medical evidence" from plaintiff's second chiropractor, Dr. Malouf. *Id.* Plaintiff also complains, more generally, that the ALJ improperly "minimized" the findings of both of his chiropractors, Dr. Gross and Dr. Malouf. *Id.* at 22. With respect to his mental impairments, plaintiff contends that the ALJ mischaracterized the findings of Dr. Hansen and Dr. Murphy, *id.* at 21, and improperly substituted her own lay medical opinion for "that of plaintiff's treating mental health professionals," who offer "a unique perspective to the medical evidence that cannot otherwise be obtained from the record." *Id.* at 22.

*Second*, plaintiff argues that the ALJ's RFC analysis is not supported by substantial evidence, because the "weight of the medical evidence in this case supports a conclusion that Plaintiff is capable of less than sedentary work." Pl. Mem. at 22-23. Plaintiff adds that, with respect to his mental impairments, "[t]he evidence is clear" that he could not "even attempt substantial gainful activity" without "a number of specific workplace accommodations, which can never be guaranteed." *Id.* at 24.

Lastly, plaintiff argues (but only in his reply brief) that the ALJ erred at step five in accepting the testimony of the VE as to jobs that a claimant with plaintiff's RFC could perform.

Pl. Reply Mem. (Dkt. No. 28) at 2-4. The VE's testimony was unreliable, according to plaintiff, because it was based on the Dictionary of Occupational Titles (DOT), which is increasingly obsolete, rather than on O*NET, an online database that (according to plaintiff) the SSA is "projected to begin using" at an unspecified time in the future. *Id.*

The Commissioner counters that the ALJ's RFC determination, as well as his conclusion that plaintiff was not disabled, were supported by substantial evidence in the record. Def. Mem. (Dkt. No. 25) at 15-25. As to plaintiff's physical impairments, the Commissioner asserts that the ALJ properly weighed the medical opinion evidence, including the opinions of plaintiff's chiropractors, who were not "acceptable medical sources" and whose opinions were therefore not entitled to the benefit of the treating physician rule. *Id.* at 19-20. As to plaintiff's mental impairments, the Commissioner argues that the opinions of Dr. Murphy and Dr. Hansen both support the ALJ's conclusions. *Id.* at 21-24. Lastly (in a sur-reply brief filed with the Court's permission), the Commissioner contends that the Court should not consider plaintiff's step five argument because it was raised for the first time in his reply brief, *see* Def. Reply Mem. (Dkt. No. 31) at 1-3, and that, in any event, the ALJ did not err in accepting VE testimony based on the DOT, which is specifically identified in the SSA's regulations as a source of "reliable job information" of which the Commissioner can take "administrative notice." *Id.* at 3-4 (quoting 20 C.F.R. § 404.1566(d)).

## III.   STANDARDS

In considering the parties' motions, I have reviewed the entire administrative record (totaling 794 pages) and applied the familiar and frequently reiterated standards used by federal district courts to review decisions of the Commissioner. Generally speaking, a court may set aside an ALJ's decision only if it is based upon legal error or if the ALJ's factual findings are not

supported by substantial evidence. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Conyers v. Comm'r of Soc. Sec.*, 2019 WL 1122952, at *11-12 (S.D.N.Y. Mar. 12, 2019).

### A.      Treating Physician Rule

Where, as here, the claim for benefits was filed prior to March 27, 2017, the court must ensure that the ALJ complied with the treating physician rule, which required her to give controlling weight to the opinion of plaintiff's treating physicians so long as those opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Put another way: "The ALJ can discount a treating physician's opinion only if the ALJ believes that it 'lack[s] support or [is] internally inconsistent.'" *Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015) (quoting *Duncan v. Astrue*, 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011)).

If the ALJ assigns less than controlling weight to the opinion of a treating physician, she must give "good reasons" for doing so, which he must "comprehensively set forth." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). "[F]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand," *Greek*, 802 F.3d at 375; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam), unless a "searching review of the record" assures the Court that "the substance of the treating physician rule was not traversed." *Estrella*, 925 F.3d at 95-96 (quoting *Halloran*, 362 F.3d at 33).

### B.      Residual Functional Capacity

A claimant's RFC is the "most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is based on all of the relevant medical and other evidence in the record, including her credible testimony, objective medical evidence, and medical opinions

from treating and consulting sources. 20 C.F.R. § 404.1545(a)(3). Although necessarily informed by the medical evidence in the record, "[a]n RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ[.]" *Curry v. Comm'r of Soc. Sec.*, 855 Fed. App'x 46, 48 n.3 (2d Cir. 2021). In determining the claimant's RFC, the ALJ is not required to accept, or follow, any one medical opinion. *See Camille v. Colvin*, 652 Fed. App'x 25, 29 n.5 (2d Cir. 2016) (summary order) ("An ALJ may accept parts of a doctor's opinion and reject others.").

### C.    Substantial Evidence

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at *21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) and *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, "the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 642 (S.D.N.Y. 2019). "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks omitted). Thus, the substantial evidence standard is "a very deferential standard of review." *Id.*

## IV.    DISCUSSION

### A.    Plaintiff Waived the Step Five Argument First Made on Reply

"The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered." *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017); *accord Clubside, Inc. v. Valentin*, 468 F. 3d 144, 159 n.5 (2d Cir. 2006); *Patterson v. Balsamico*, 440 F. 3d 104, 113 n.5 (2d Cir. 2006). Plaintiff, who is represented by counsel, offers the Court no reason to depart from thats rule here.

In any event, plaintiff's contention that the VE's testimony was "unreliable" because she in turn relied on the DOT rather than O*NET, *see* Pl. Reply Mem. at 2-4, is without merit. *See Johnson v. Saul*, 2020 WL 6562402, at *11 (D. Conn. Nov. 9, 2020) ("[I]t is well settled that the DOT, despite not having been updated in more than 25 years, remains an accepted basis for vocational opinion according to the Commissioner's rules.") (internal quotation marks omitted) (collecting cases); *see also Murnahan v. Comm'r of Soc. Sec.*, 2020 WL 7024847, at *5 (N.D. Ohio Nov. 30, 2020) (noting approvingly that ALJs "rely primarily" on the DOT, and that "there is no rule or regulation requiring [ALJs] to compare a VE's testimony to the O*NET").

### B.    The ALJ Did Not Violate the Treating Physician Rule or Otherwise Err in Evaluating the Medical Opinion Evidence

Plaintiff argues that the ALJ inappropriately "minimized the opinions and findings of Plaintiff's treating sources," in particular his chiropractors, Dr. Gross and Dr. Malouf, in assessing his physical impairments. Pl. Mem. at 22. As the Commissioner points out, however, the opinions of chiropractors are not entitled to controlling weight under the treating physician rule because they are not "acceptable medical sources" under the SSA's regulations. *See* 20 C.F.R. § 404.1502(a); *Brush v. Berryhill*, 294 F. Supp. 3d 241, 259 (S.D.N.Y. 2018) ("[B]ecause a chiropractor is not an 'acceptable medical source,' an ALJ is not required to give a chiropractor's

opinion controlling weight under the Commissioner's regulations for treating sources."). ALJ Wallis therefore did not commit legal error either by failing to give Dr. Gross's opinions controlling weight or by assigning a "lower probative value" to those opinions in recognition that he was not an acceptable medical source. (R. 27.)[2]

Nor did the ALJ err when she evaluated the opinions of Dr. Gross as "other evidence," *see* 20 C.F.R. § 404.1513(a)(3), and concluded that they were not entitled to "substantial weight." (R. 26.) She correctly noted that Dr. Gross opined as to plaintiff's specific functional limitations only once, in July 2015 (R. 570), and that thereafter the contents of his treating notes were "repeated, nearly verbatim, from visit-to-visit," and "merely reiterate[d] that the claimant was 'disabled'" for "a set period of time." (R. 26-27.) The ALJ was also correct that – regardless of Dr. Gross's professional license – his various opinions that plaintiff was "disabled" or "unable to work" (R. 563-64, 588, 590-91, 595-96, 616-17, 619-20) were entitled to no weight at all, because those issues are reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Schillo v. Kijakazi*, 2022 WL 1020381, at *2 (2d Cir. 2022) ("The ultimate finding of whether the claimant is disabled is reserved to the agency."); *Killings v. Comm'r of Soc. Sec.*, 2016 WL 4989943, at *13 (S.D.N.Y. Sept. 16, 2016) ("Dr. Dokko's statement that the plaintiff's conditions 'make it impossible for her to work'" is "an opinion on an issue reserved to the Commissioner," such that "the ALJ was not

---

[2] Although the ALJ did not explicitly discuss Dr. Malouf in this section of the Decision, he too was a chiropractor and therefore not an acceptable medical source under SSA regulations.

required to give it special weight"), *report and recommendation adopted sub nom. Killing v. Comm'r of Soc. Sec.*, 2016 WL 6952342 (S.D.N.Y. Nov. 28, 2016); *Guzman v. Astrue*, 2011 WL 666194, at \*10 (S.D.N.Y. Feb. 4, 2011) ("[A] treating physician's opinion that the claimant is 'disabled' or 'unable to work' is not controlling.").[3]

Plaintiff's argument that the ALJ improperly relied on the opinion of State agency reviewer Dr. Holmberg because it was rendered too "early in the disability review process," without the benefit of Dr. Malouf's "after-acquired" treating notes, Pl. Mem. at 20, fares no better. "[M]edical source opinions that are . . . stale[ ] and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." *Cepeda v. Comm'r of Soc. Sec.*, 2020 WL 6895256, at \*10 (S.D.N.Y. Nov. 24, 2020) (alterations in original) (quoting *Camille v. Colvin*, 104 F. Supp. 3d 329, 343-44 (W.D.N.Y. 2015), *aff'd*, 652 Fed. App'x 25 (2d Cir. 2016)). However, "[f]or a medical opinion to be stale, not only must there be a significant period of time between the date of the opinion and the hearing date, there also must be subsequent treatment notes 'indicat[ing] a claimant's condition has deteriorated' over that period." *Ambrose-Lounsbury v. Saul*, 2019 WL 3859011, at \*3 (W.D.N.Y. Aug. 16, 2019) (second alteration in original) (quoting *Whitehurst v. Berryhill*, 2018 WL 3868721, at \*4-5 (W.D.N.Y. Aug. 14, 2018)); *see also Camille*, 104 F. Supp. 3d at 344 (ALJ did not err in relying on opinion of state agency reviewer Dr. Kamin,

---

[3] Although the ALJ did not explicitly discuss Dr. Malouf's opinions in this section of the Decision, this was, at most, harmless error, because Dr. Malouf never provided any specific function-by-function guidance. Most of the opinions authored by Dr. Malouf were his frequent "excuse slips" in which he stated that plaintiff was "unable to work at this time" because of the injuries he sustained in the 2014 auto accident. (R. 539, 545-49, 553.) For the same reasons discussed above in connection with Dr. Gross, the ALJ was not required to give such statements any weight at all. *See Boffoli v. Comm'r of Soc. Sec.*, 2022 WL 973754, at \*8 (S.D.N.Y. Mar. 31, 2022) ("any error in failing to afford proper weight" to opinion of social worker was "harmless" where, among other things, social worker opined that claimant's "depression renders her 'unable to work,'" which was a determination "'reserved to the Commissioner'") (quoting 20 C.F.R. § 404.1527(d)(1)).

even though his opinion "was based on only part of the overall administrative record," because "the treatment notes and opinions in the record before and after Dr. Kamin's opinion demonstrate substantially similar limitations and findings").

In this case, the agency received "MER" (medical evidence of record) from Dr. Malouf on March 13, 2017 (R. 53, 78), and Dr. Homberg rendered his opinion on April 6, 2017. (R. 83-85.) This was not particularly "early in the disability review process." Indeed, Dr. Holmberg also reviewed – among other things – imaging studies, treatment records from Dr. Jacobs and Dr. Rosenblatt, and the consultative report of Dr. Caruso – who, as noted above, concluded only that plaintiff had a "mild" visual limitation and "moderate" limitations for bending, twisting, and kneeling. (R. 380.) Moreover, while plaintiff's counsel later submitted additional treatment records from Dr. Malouf, under cover of a letter dated November 26, 2018 (R. 429), the latest such record is dated April 7, 2017. (R. 518.) It reports – like virtually all of Dr. Malouf's 2017 treating notes – that plaintiff complained of headache, low back pain radiating into the right hip, with numbness and tingling, and neck pain; that he "felt a little better after treatment"; that he was "progressing: slowly," both "subjectively" and "objectively"; that he should perform a home stretching and exercise protocol to "become more pro active in their self care"; and that he should return for further treatment twice a week. (R. 499-518.)[4] Plaintiff does not point to anything in those treating notes indicating that plaintiff's condition "deteriorated" while he was under Dr. Malouf's care. The fact that some of them were "after-acquired," therefore, does not make Dr. Holmberg's opinion stale or otherwise cast doubt on the ALJ's decision to assign it substantial weight.

---

[4] In his earlier notes, dating from 2016, Dr. Malouf recommended that plaintiff return for treatment three times per week. (*E.g.*, R. 446, 453, 456-58.)

With regard to the mental opinion evidence, plaintiff contends that the ALJ committed a "gross mischaracterization" of the opinions of Dr. Murphy and Dr. Hansen, Pl. Mem. at 21, when she wrote that both of these examining sources agreed that plaintiff "would struggle with higher level executive functions . . . but would have no more than 'mild,' at most, limitations with simple tasks, interacting with others, and adapting to changes." (R. 26.) According to plaintiff, this was error, in that Dr. Murphy "opined that Plaintiff's ability to sustain ordinary routine and regular attendance at work; regulate emotions; control behavior; and maintain well-being (all abilities important to sustain any and all types and levels of occupations) were all moderately limited, not mildly limited," Pl. Mem. at 21, and Dr. Hansen "specifically found that Plaintiff would have diminished ability to adapt to changing task requirements" and was "clear in warning that attention deficits would likely be exacerbated by increased demands at work, and therefore that several accommodations would be required of an employer if Plaintiff were to be able to maintain employment and perform successfully." *Id.*

The ALJ did not mischaracterize the record. To the contrary: she summarized Dr. Murphy's findings precisely and accurately, as follows:

> Dr. Murphy opined that the claimant would have no limitations whatsoever in the ability to understand, remember or apply *simple* directions; "mild limitation" in the ability to use reason and judgment to make work related decisions and to interact appropriately with others (supervisors, coworkers, members of the public); and "moderate" limitations in understanding, remembering and applying *complex* directions and instructions and in regulating emotions, controlling behavior and maintaining well being.

(R. 25 (emphases added).) Moreover, although the ALJ discounted Dr. Murphy's opinion that plaintiff had "moderate" behavior or emotional control issues and/or difficulty with "maintaining well being" as "grossly unsupported" by anything in Dr. Murphy's report or elsewhere in the record (R. 26), she *accepted* Dr. Murphy's view – incorporated in Dr. Momot-Baker's opinion – that plaintiff would have difficulty with "higher level executive functions," including "complex work"

and "multitasking" (*id.*), and consequently limited him to jobs requiring him to "understand, remember and carry out *simple* tasks and job instructions" and respond to "*routine* changes in the workplace." (R. 21 (emphasis added).)

Similarly, the ALJ accurately summarized Dr. Hansen's "somewhat mixed" conclusions (R. 25), including her finding that that plaintiff demonstrated "impairment in sustained and divided attention," that is, the ability to multitask, which would "'likely' be exacerbated by increased demands at work." (*Id.*) The ALJ also noted, correctly, that according to Dr. Hansen, plaintiff "functioned within the average range in most other areas of cognition," including "verbal memory; visuospatial skills; receptive and expressive language; working memory; the ability to think flexibly and solve novel problems." (*Id.*)[5] Dr. Hansen did state – as the ALJ acknowledged –that plaintiff would benefit from certain accommodations. (R. 25, 283.) She did *not*, however, conclude that accommodations "would be required," Pl. Mem. at 21, for plaintiff to be able to maintain employment. Rather – as the ALJ correctly stated – Dr. Hansen "opined that the claimant's cognitive deficits were 'not deemed disabling with respect to maintenance of gainful employment.'" (R. 25.) The record therefore does not support plaintiff's claim that the ALJ mischaracterized – or misweighted – the medical opinion evidence in the record.

---

[5] This is a near-verbatim summary of the pertinent portion of Dr. Hansen's report. (R. 283.) *See* Part I.A.3 of this Opinion and Order, *supra.* Elsewhere, Dr. Hansen found that plaintiff's mental functioning was "well above average" in certain areas related to executive functioning, including his "ability to shift cognitive sets," which was "suggestive of undiminished cognitive flexibility." (R. 282.) He also demonstrated "intact ability" to "change problem solving strategies as needed" and had "no difficulties with processing and comprehending multiple step directions provided orally." (*Id.*) As noted above, however, in formulating plaintiff's RFC, the ALJ accepted the more restrictive view of Dr. Murphy and Dr. Momot-Baker – that plaintiff would have difficulty with "higher level executive functions," including "complex work" (R. 26), and could only be expected to perform "simple" tasks in response to "simple" instructions. (R. 21.)

### C.      Substantial Evidence Supports the ALJ's RFC Determination

The substantial evidence standard is a "very deferential standard of review," *Brault*, 683

F.3d at 448, permitting the Court to reject the ALJ's findings only if "a reasonable factfinder would

*have to conclude otherwise*." *Id.* (emphasis in original). Here, plaintiff makes no real effort to carry

his heavy burden under the substantial evidence standard. Instead, he contends that the "weight of

the medical evidence" supports a disability finding, and thereby explicitly asks this Court to do

what it cannot do under the Act; that is, "reweigh [the] evidence" that was before the ALJ and

"substitute its judgment for that of the ALJ." *Rivera*, 368 F. Supp. 3d at 642.

To be sure, there is some evidence in the record that would support the conclusion that

plaintiff had greater limitations than those the ALJ incorporated into her RFC determination. But

that is not the test. "If the reviewing court finds substantial evidence to support the Commissioner's

final decision, that decision must be upheld, even if substantial evidence supporting the claimant's

position also exists." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). Here, the

record yields ample evidence – from treating and non-treating sources alike – supporting the ALJ's

determination that plaintiff is capable of performing sedentary work with additional postural,

mental, and environmental restrictions.[6] I am therefore required, under the "very deferential

standard of review" that applies to ALJ fact-finding, to accept the Commissioner's RFC

determination, *see Brault*, 683 F.3d at 448; *see also Blalock v. Berryhill*, 2018 WL 6332896, at

*14 (S.D.N.Y. Nov. 8, 2018) ("[T]he existence of contrary evidence does not negate substantial

evidence supporting the ALJ's decision."), and, hence, her determination of non-disability.

---

[6] Indeed, an argument could be made that the mental restrictions were unnecessary, given that
Dr. Hansen – who performed the most comprehensive neuropsychological testing and prepared
the most detailed analysis of plaintiff's mental functioning – found only a few areas of mild
difficulty, which did *not* include any deficits in information processing, verbal memory, language
skills, or "the ability to think flexibly and solve novel problems." (R. 283.)

## V.     CONCLUSION

Because the Decision is free from legal error and the ALJ's findings and conclusions are supported by substantial evidence, plaintiff's motion (Dkt. No. 20) is DENIED, the Commissioner's motion (Dkt. No. 24) is GRANTED, and this action is dismissed.

The Clerk of Court is respectfully directed to close the case.

Dated:  New York, New York            **SO ORDERED.**
         April 29, 2022

**BARBARA MOSES**
**United States Magistrate Judge**